COPY

FILED

2012 MAY 11 PM 2:41

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:

JEFF A. HARRISON (SBN 151227)
ADAM S. CHERENSKY (SBN 263062)
**BARBOSA, METZ & HARRISON, LLP**
139 Richmond Street
El Segundo, CA 90245
Tel: (310) 414-9400
Fax: (310) 414-9200
JHarrison@bmhlegal.com
ACherensky@bmhlegal.com

Attorneys for Plaintiffs,
ARNIE T. PIKE
CHRISTIE RUDDER

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SACV12-767.AG (RNBx)

By Fax

ARNIE T. PIKE and CHRISTIE RUDDER, individuals;

Plaintiffs,

vs.

CBS BROADCASTING, INC.; HUDSON PACIFIC PROPERTIES, INC.; SUNSET GOWER ENTERTAINMENT PROPERTIES, LLC; SUNSET BRONSON ENTERTAINMENT PROPERTIES, LLC; FREMANTLEMEDIA NORTH AMERICA; and DOES 1 through 10, inclusive,

Defendants.

) Case No.:

) **Civil Rights**

) **COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES:** FOR DISABILITY DISCRIMINATION IN VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT AND CALIFORNIA'S CIVIL RIGHTS STATUTES (Health & Safety Code § 19955 *et seq*. and Civil Code §§ 51, 54, 54.1)

) **DEMAND FOR JURY TRIAL**

Plaintiffs ARNIE T. PIKE and CHRISTIE RUDDER complain of Defendants CBS BROADCASTING, INC.; HUDSON PACIFIC PROPERTIES, INC.; SUNSET GOWER ENTERTAINMENT PROPERTIES, LLC; SUNSET BRONSON ENTERTAINMENT PROPERTIES, LLC; FREMANTLEMEDIA NORTH AMERICA; and DOES 1 through 10, inclusive, and allege as follows:

## INTRODUCTION

1. The Americans with Disabilities Act ("ADA") was enacted over twenty years ago, establishing the most important and comprehensive civil rights law for persons with disabilities in our country's history. One of the principal goals of the ADA is the integration of people with disabilities into the country's economic and social life. 42 U.S.C. § 12101(a). Despite this long-standing mandate, Defendants – the owners, operators, lessors, and lessees of the public accommodation located at 5800 Sunset Boulevard, Los Angeles, CA 90028, where the televised game show "Let's Make A Deal" is produced – have failed to provide disabled persons with full and equal access to their facilities, goods, and services in violation of Title III of the ADA. Specifically, Defendants have constructed and/or have failed to remove architectural barriers that prevent persons who use wheelchairs from equal use and enjoyment of their facilities. Furthermore, Defendants have failed to provide accessible parking for persons in wheelchairs who want to use their facilities. In so doing, Defendants have also violated California's civil rights laws, including Health & Safety Code § 19955 *et seq*., and the Unruh Civil Rights Act, Cal. Civ. Code § 51 *et seq*.

2. As a result of Defendants' discriminatory acts and omissions, Plaintiffs have suffered, and will continue to suffer, damages, and have been, and will continue to be, prevented and deterred from accessing and using Defendant's goods, services and facilities to the same extent as, and in a manner equal to, their able-bodied peers.

Through this lawsuit, Plaintiffs seek compensation for their injuries and an injunction requiring Defendants to provide "full and equal" access to their public facilities for disabled persons as required by law.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 for violations of the ADA, 42 U.S.C. § 12101 *et seq*. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine Plaintiffs' state law claims because they are related to Plaintiffs' federal claims and arise out of a common nucleus of operative facts.

4. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) and is founded on the fact that the real property which is the subject of this action is located in the Central District and that Plaintiffs' causes of action arose in the Central District.

## PARTIES

5. Plaintiff ARNIE T. PIKE ("Pike") is, and at all times relevant herein was, a qualified individual with a physical "disability" as defined under the ADA (42 U.S.C. § 12101 *et seq.*); Department of Justice regulations (28 C.F.R. § 36.104); and California Government Code § 12926. Plaintiff Pike is unable to independently stand or walk, has limited range of motion in his arms as the result of a major stroke, and requires the use of a wheelchair for mobility and the use of a trained, certified service dog to assist him in using public accommodations. Plaintiff Pike is unable, due to his disability, to independently use public facilities that are not designed and/or constructed in compliance with applicable accessibility standards to accommodate disabled persons who require a wheelchair for mobility. Plaintiff Pike is, and at all times relevant hereto was, a resident of California.

6. Plaintiff CHRISTIE RUDDER ("Rudder") is, and at all times relevant

herein was, a qualified individual with a physical "disability" as defined under the ADA (42 U.S.C. § 12101 *et seq.*); Department of Justice regulation 28 C.F.R. § 36.104 and California Government Code § 12926. Plaintiff Rudder is unable to independently stand or walk, has limited range of motion in her arms as the result of injuries sustained in car accidents, and requires the use of a wheelchair for mobility. Plaintiff Rudder is unable, due to her physical disability, to independently use public facilities that are not designed and/or constructed in compliance with applicable accessibility standards to accommodate disabled persons who require a wheelchair for mobility. Plaintiff Rudder is, and at all times relevant hereto was, a resident of California.

7. On information and belief, Defendants CBS BROADCASTING, INC.; HUDSON PACIFIC PROPERTIES, INC.; SUNSET GOWER ENTERTAINMENT PROPERTIES, LLC; SUNSET BRONSON ENTERTAINMENT PROPERTIES, LLC; FREMANTLEMEDIA NORTH AMERICA; and DOES 1 through 10, inclusive, (collectively "Defendants"), are, and at all times relevant herein were, the owners, operators, lessors and/or lessees of the Sunset Bronson Studios, an entertainment and media complex located at 5800 Sunset Boulevard, Los Angeles, CA 90028 ("the Studio"), where the televised game show "Let's Make A Deal" is produced.

## FACTS UPON WHICH ALL CLAIMS ARE BASED

8. "Let's Make A Deal" ("LMAD") is one of the most popular American game shows ever produced. Plaintiffs Pike and Rudder have been fans of LMAD for several years; Rudder's mother, in fact, was a contestant on the show in the late 1960s. LMAD first aired in December, 1963, and was on the air almost every year through 1986. After a few brief reincarnations of LMAD in the 1990s and 2000s, LMAD was revived in October, 2009 and debuted as a new series hosted by Wayne

Brady and broadcasting on CBS, where it still currently airs. The current version of LMAD originally taped its shows in Las Vegas. After a few months, however, LMAD relocated its set to the Studio, where it continues to tape shows to the present day. Although the Studio was originally constructed in or around 1940, the trailers and sound stage where LMAD contestants are processed and attend the taping, respectively, were all constructed and/or significantly altered since 2009.

9. LMAD invites the general public to order free audience tickets to attend tapings. Audience members are encouraged to attend the taping in costume – the more outlandish and original the costume, the better. During the taping, a few audience members are selected by Mr. Brady to be contestants, and are thus given an opportunity to win cash and/or valuable prizes. On the face of its tickets, LMAD asserts that it is "committed to making every taping equally accessible to persons with disabilities." In reality, however, Defendants have constructed and/or failed to remove a series of barriers at the Studio, thus precluding disabled LMAD audience members from enjoying the full and equal experience offered to able-bodied audience members.

10. The Studio is a "place of public accommodation" as defined under 42 U.S.C. § 12181(7)(A) and 28 C.F.R. § 36.104(1)(i), and California civil rights laws. Cal. Civ. Code §§ 51, 54 *et seq*.; and Health & Saf. Code § 19955 *et seq.*

11. Plaintiffs and other similarly situated physically disabled persons who require the use of a wheelchair or other mobility device, are unable to use Defendants' facilities on a "full and equal" basis unless and until these facilities are brought into compliance with the requirements of Title III, 42 U.S.C. § 12181 et seq.; California Health & Safety Code § 19955 et seq.; and California Code of Regulations, Title 24-2 ("Title 24-2"), all of which are designed to ensure full and equal access for persons with disabilities in places of public accommodation. Plaintiffs are members of that portion of the public whose rights are protected by

these laws.

**Plaintiffs' Visit to LMAD**

12. Pike requested tickets for LMAD in the late spring and/or early summer of 2011. At that time, Pike requested accessible seating for himself and Rudder. Pike and Rudder decided to arrive to the taping in costume to increase their chances of being selected as contestants. Pike would dress as a golfer, while Rudder would dress as a wine lover (with empty wine bottles hanging from her wheelchair and her hat).

13. On or about July 29, 2011, Plaintiffs Pike and Rudder arrived in costume in Pike's van at the Studio in the morning, and drove up to the Studio gate entrance. At that time, Plaintiffs were informed by a Studio security guard that there was no on-site parking available for LMAD audience members, even for those who are disabled. The closest accessible parking available to the Studio was at the Denny's restaurant diagonally across from the Studio audience entrance on Sunset Boulevard.

14. Pike was concerned about parking in the Denny's lot, because, on his information and belief, he and Rudder would be at the Studio for most of the day for the entire intake and taping process. To ensure that his van would not be ticketed or towed, Pike spoke with the Denny's manager on-site, and promised him that Pike and his party would eat both breakfast and dinner at Denny's that day, if the manager would let Pike park his van in the Denny's lot all day. The manager agreed, but directed Pike to park in the far back portion of the lot, rather than in the accessible space nearest to Denny's, and to the Studio.

15. As a result of Defendants' failure to provide disabled LMAD audience members with accessible parking, Plaintiffs were forced to undertake a dangerous and inaccessible path of travel from the back of the Denny's parking lot, across two extremely busy city streets (Sunset Boulevard and Van Ness Avenue), over a steep curb cut on the sidewalk adjacent to the Studio, and down a narrow sidewalk to the audience entrance. Rudder, who uses a manual wheelchair, was unable to navigate

the curb cut by herself, and required assistance from Pike to get onto the curb, causing her frustration and embarrassment.

16. After finally traversing that path of travel, Plaintiffs encountered a line of LMAD audience members standing on the sidewalk, waiting for entry into the Studio grounds. A woman who represented herself as an LMAD employee introduced herself, and escorted Plaintiffs out of the line to wait in a separate area.

17. After waiting, Plaintiffs were directed south along a path to the first of two raised trailers, where LMAD employees process the contestants before the taping begins. This path of travel to the first trailer was a darkened, narrow, concrete, ivy-covered walkway, with a continuous bench on one side and a curb drop-off on the other side. The inaccessibility of the pathway caused Rudder to experience discomfort en route to the first trailer.

18. At the first trailer, the only point of entry for Plaintiffs was a very steep, very slippery ramp. Both Plaintiffs had difficulty traversing this barrier, but it was especially difficult for Rudder to do so in her manual wheelchair. When she first attempted to go up the ramp, the wheels slipped, and she fell frighteningly backwards. A Studio security guard had to jump over a nearby railing to grab her chair from behind – without the guard's efforts, Rudder would have certainly fallen, and quite possibly suffered serious injury. The guard then attempted to push Rudder up the ramp, but he also struggled with the steepness and slipperiness of the ramp – so much so that he literally fell on his face, causing Rudder great concern and embarrassment. While Rudder did eventually get up the ramp with the guard's help, she injured her shoulder in the process of repeatedly grabbing her chair and bracing herself to prevent a fall during all of the attempts to go up the ramp. In short, Defendants' inaccessible ramp turned what should have been a simple building entry into a scary, painful living nightmare for Rudder.

19. In the first trailer, Plaintiffs were given nametags and had their pictures

taken. When this process was complete, Plaintiffs were directed to move to a second, adjacent trailer. To move between trailers, Plaintiffs were required to descend the steep, slippery ramp that they used to enter the first trailer, and then go up a virtually identical steep, slippery ramp to enter the second trailer. Predictably, Plaintiffs also experienced significant difficulty navigating the ramp to the second trailer, causing them fear and frustration.

20. At some point after entering the first trailer and leaving the second trailer, Pike and Rudder asked an LMAD representative for an accessible place to purchase food. They were told that there was no accessible place for them to purchase food, and were then brought soda and/or water by an LMAD representative. By failing to provide Plaintiffs with an accessible place to purchase food, Defendants caused Plaintiffs significant inconvenience (because the entire process of attending a taping can take up to five (5) hours or more) and frustration.

21. At some point after entering the first trailer and leaving the second trailer, Pike asked an LMAD representative for the use of an accessible restroom. Pike was told that there was no accessible restroom for him to use. Defendants' failure to provide Pike with an accessible restroom caused him significant discomfort, especially considering that Pike was at the Studio for the taping process for up to five (5) hours or more.

22. Pike and Rudder were interviewed in the second trailer by LMAD representatives, for contestant screening purposes. Afterwards, Pike and Rudder were escorted by an LMAD representative, down the same steep, slippery ramp that they had climbed to enter that trailer, to an outdoor waiting area specifically designated for disabled audience members. Pike, Rudder, and Pike's wife Marilynn (who also attended the taping) were the only audience members directed to this area. The waiting area was right next to the designated smoking area for audience members, as well as several trash receptacles, and was directly in the sun. Plaintiffs,

on their own accord, eventually moved to a nearby spot in the shade for some relief from the sun. Conversely, the waiting area for able-bodied audience members was not directly adjacent to the smoking area, and was shaded from the sun. In this manner, Plaintiffs were provided with a waiting area that was unequal to that provided to able-bodied contestants. This discrepancy caused Plaintiffs frustration and discomfort, especially because their wait in this area lasted up to an hour or more.

23. After the long wait, Plaintiffs were finally escorted by an LMAD representative towards the soundstage where LMAD is taped. They were taken on a long, circuitous path through the Studio parking lots to get to the soundstage. This path of travel posed significant barriers for Plaintiffs, as they had to navigate through moving vehicles and on uneven terrain, including several speed bumps. On information and belief, able-bodied audience members were provided with a much more direct, and less dangerous, path of travel than were Plaintiffs.

24. As Plaintiffs finally approached the soundstage, Rudder saw at least four (4) accessible parking spaces in the lot directly in back of the soundstage. Only one of these spaces was occupied by a vehicle with a disabled parking placard – the rest were occupied by vehicles without such a placard. Upon witnessing these spaces, Rudder became very upset, as she and Pike had been denied readily available nearby accessible parking, and instead been compelled to park far away and traverse a dangerous and inaccessible path of travel to reach the Studio.

25. Before entering the soundstage, Plaintiffs were directed to wait outside in a tented area, because there was another LMAD show taping ahead of the one that they would be attending. On information and belief, other audience members who had arrived at approximately the same time to the Studio as Plaintiffs had been granted admission to the earlier taping. Plaintiffs had to wait in the tented area for approximately forty-five (45) minutes. While there, they were provided with water, but had no opportunity to obtain food.

26. At some time before entering the soundstage, Rudder asked an LMAD representative what Plaintiffs' chances were of being selected as contestants. The representative replied that everyone in the audience has a chance to become a contestant, based on enthusiasm demonstrated to LMAD's producers, director, and host. Rudder then questioned whether Plaintiffs would be able to access the contestant stage if they were to be chosen as contestants. She was told not to worry, because LMAD had provisions to provide access to the contestant stage if necessary.

27. After waiting in the tented area, Plaintiffs were directed to enter the soundstage for the taping. To do so, Plaintiffs had to go up a concrete ramp. At the foot of the ramp, there was a very large, immovable barrier of tangled wires and cables, which was loosely covered by plywood and possibly carpet. There was no way to ascend the ramp without going over this barrier. After four (4) or five (5) failed attempts at doing so, Rudder finally went over the barrier by performing a very dangerous maneuver known as "popping a wheelie," in which she leans far back in her wheelchair to get the chair's front wheels into the air. Once over the barrier, Rudder had neither the momentum nor the strength to ascend the ramp under her own power, so she had to be pushed up the ramp by an LMAD representative. This entire sequence of events caused Rudder to feel humiliated, embarrassed, frustrated, exhausted, and fearful of serious injury.

28. Once inside the soundstage, Plaintiffs were separated from the other audience members, and taken through a corridor behind the audience seating area to their seats. The corridor was inaccessible, as it was extremely dark, and contained an obstruction of tangled cables, plywood and carpet similar to the obstruction at the bottom of the soundstage entry ramp.

29. Plaintiffs were directed to a seating area at the extreme front and right of the audience. Their views were perpetually obstructed by approximately six (6) cameras, as well as countless wires and cables, surrounding their immediate seating

area. Some of those cables, while being operated, repeatedly hit Rudder's feet, causing her annoyance and discomfort. Furthermore, an LMAD technician operating a hand-held camera often stood directly in front of Plaintiffs, blocking their lines of sight.

30. When audience members were selected to be contestants, they would join the host on a small stage in the middle of the audience. Plaintiffs' view of that stage was obstructed, because of their location at the extreme front right of the audience. Moreover, contestants had to ascend one or two steps to reach the stage. Rudder again felt compelled to ask an LMAD representative how she or Pike would reach the contestant stage if selected; she was told that, if they were selected, someone would bring out a ramp for them to reach the stage. There was no such ramp visible to Plaintiffs anywhere in the soundstage at any time during the taping.

31. After the taping ended, Plaintiffs were again forced to encounter the same barriers that they had faced when entering the soundstage – the darkened corridor and wire obstacle behind the seating area, and the wire obstacle at the foot of the ramp at the soundstage entrance/exit. The barrier at the foot of the ramp was especially difficult for Plaintiffs to traverse on the way down – when Rudder first tried to surmount it, she was unable to do so, and as a result she fell backwards into Pike, who was approaching the barrier behind her. In this manner, the barrier caused both Pike and Rudder to experience fear and embarrassment.

32. Once Plaintiffs reached the bottom of the ramp, there was no one from LMAD present to escort them back to their vehicle. Thus, Plaintiffs were forced to navigate a long, inaccessible route back to the Denny's parking lot on their own, which included having to navigate an unavoidable traffic arm at the studio entrance.

**<u>Other Barriers at the Studio</u>**

33. On information and belief, there are other access barriers and discriminatory policies that exclude and deter Plaintiffs and others similarly situated

from enjoying full and equal access to and use of the same goods, services, facilities, privileges, advantages, and accommodations offered by Defendants to the general public, including, but not limited to, the following:

***Entry Queue:***

- The entry queue line at the north side of the facility is on a sidewalk too narrow to accommodate more than a single path of travel; wheelchair users directed to the front of the line are compelled to traverse a grass parkway obstructed by multiple trees and marked by several holes and depressions, which are difficult to see through the grass.

***Security Device:***

- The clear passage through this device is possibly too narrow for wheelchair entrance;
- There is an approximately 2-inch high plastic or metal raised portion with steep ramps at both openings, which makes the device inaccessible to wheelchair users; and
- A wheelchair would set off the device automatically, causing wheelchair users embarrassment.

***First Trailer:***

- The queue line inside the first trailer contains multiple switchbacks and ropes, and is too narrow for wheelchair users to navigate;
- The tables where audience members fill out forms appear to have cross bracing that would interfere with the knee clearance of wheelchair users; and
- Table cloths hanging from the tables obscure that cross bracing from wheelchair users' sight, presenting a risk to wheelchair users of injuries to their lower extremities.

***Food and Drink Area:***

- There is an area between the two trailers where audience members can purchase prepared food and drinks; there is an approximate 5-inch drop from the walkway to this area, and no curb ramp or apparent alternate route is provided for wheelchair access to this area;
- A raised plastic or metal cable cover, approximately 2 inches high with steep inaccessible ramps at each side, cuts across the entire space between the food and drink area and the curb; and
- The seating in this area is inaccessible because it provides no knee clearance.

***Second Trailer:***

- The two small rooms where audience members are asked to wait to be interviewed are filled with chairs, and do not have enough space for a wheelchair user to wait comfortably; and
- The unisex accessible restroom in this trailer is unavailable to audience members in wheelchairs; a paper sign, which covers up all indication of the room's identity as a restroom, states that the room is for staff only; and
- The queue line inside the second trailer contains multiple switchbacks and ropes, and is too narrow for wheelchair users to navigate.

***Waiting Area Outside of the Second Trailer:***

- The designated waiting area for audience members is a narrow walkway, lined with a bench seat on one side, and interrupted in the middle by a drive aisle; this path is too narrow for wheelchair users to traverse;
- The walkway is inaccessible because of excessive slopes and surface irregularities;
- The portion of the walkway leading to the restrooms designated for

waiting audience members is habitually blocked by standing and seated audience members, who cannot move aside to accommodate a wheelchair user because the path is physically bounded on both sides; and

- The only alternate route past the obstructed walkway is a vehicular drive aisle to the east; audience members who attempt to travel this alternate route are stopped by LMAD personnel and directed back to the walkway.

***Men's Restroom:***

- The single-accommodation men's restroom designated for audience member use is not accessible for numerous reasons, including:
    - The entrance door is too heavy and lacks required door maneuvering clearances;
    - There is insufficient space for a wheelchair to turn around;
    - There is less than the required minimum clearances on the side of the toilet, due to the proximity of the sink;
    - A large waste receptacle obstructs the required minimum clearance in front of the toilet;
    - There are no grab bars provided at the toilet;
    - The sink is a pedestal type and lacks required knee clearance;
    - The sink is not a single control unit, and requires tight grasping and twisting of the wrist;
    - The mirror is mounted too high; and
    - The accessories, including the seat cover dispenser, are mounted too high and outside of accessible reach ranges.

***Wheelchair Seating at the Taping:***

- The soundstage where LMAD is taped holds approximately 200-250

audience members; facilities with a seating capacity of 51-300 require at least four (4) wheelchair locations with adjacent companion seats, but the LMAD soundstage has less than the required number of such locations.

34. Plaintiffs want to return to LMAD in the future, because they enjoy watching the show in person, and would still like the opportunity to become contestants on the show. Until the barriers at LMAD are removed, Plaintiffs will continue to suffer discrimination by being excluded and deterred from returning to LMAD, and will continue to be denied full and equal access to and use of the same goods, services, facilities, privileges, advantages, and accommodations offered by Defendants to the general public.

35. As the result of Defendants' acts and omissions, as herein described, Plaintiffs were, and will continue to be denied full and equal access to the goods, services, facilities, privileges, advantages, or accommodations of LMAD, and have suffered discrimination, humiliation, pain, emotional distress, and embarrassment, all to their damage. The ongoing nature of Defendants' discrimination constitutes an ongoing violation, and unless enjoined by this Court, will result in ongoing and irreparable injury.

## V. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### VIOLATION OF THE
### AMERICANS WITH DISABILITIES ACT – TITLE III
### 42 USC § 12101 *et seq.*

36. Plaintiffs replead and incorporate by reference, as if fully set forth again herein, the allegations contained in Paragraphs 1 through 35 of this Complaint.

37. In 1990 the United States Congress found that laws were needed to more fully protect some 43 million Americans with one or more physical or mental disabilities; that "historically, society has tended to isolate and segregate individuals

with disabilities;" that "such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;" that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living and economic self-sufficiency for such individuals;" and that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous." 42 U.S.C. § 12101.

38. Congress stated as its purpose in passing the Americans with Disabilities Act, 42 U.S.C. § 12101(b):

"It is the purpose of this chapter:

1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;
2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;
3) to ensure that the Federal government plays a central role in enforcing the standards established in this act on behalf of individuals with disabilities; and
4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities."

39. As part of the ADA, Congress passed "Title III - Public Accommodations and Services Operated by Private Entities." 42 U.S.C. § 12181 *et seq*. Among "private entities" which are considered "public accommodations" for purposes of this title are "theater[s]" and "place[s] of exhibition or entertainment." 42 U.S.C. §12181(7)(D).

40. Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

41. Defendants have discriminated against Plaintiffs on the basis of their disabilities in violation of Title III of the ADA and its implementing regulations. Defendants' discriminatory conduct includes, but is not limited to:

a) Discriminatory exclusion and/or denial of goods, services, facilities, privileges, advantages, accommodations, and/or opportunities;

b) Provision of goods, services, facilities, privileges, advantages, and/or accommodations that are not equal to those afforded non-disabled individuals;

c) Failing to design and/or construct facilities built for joint occupancy after January 26, 1993 as that they are readily accessible to and usable by individuals with disabilities in accordance with the ADA Standards for Accessible Design (ADA Standards), 28 C.F.R. pt. 36, app. A 42 U.S.C. § 12183(a)(i); 28 C.F.R. § 36.401, 36.406(a);

d) Since January 26, 1992, failing to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facilities are readily accessible to and usable by individuals with disabilities in accordance with the ADA Standards. 42 U.S.C. § 12183(a); 28 C.F.R. §§ 36.402, 36.403, 36.406;

e) Since July 26, 1991, failing to comply with the ongoing obligation to remove barriers, and/or provide path of travel upgrades to remove barriers at facilities where such removal is "readily achievable." 42 U.S.C. § 12182(a)(2)(A)(iv); 28 C.F.R. § 36.304.

42. Pursuant to the remedies, procedures, and rights set forth in 42 U.S.C. § 12188 and 42 U.S.C. § 12205, Plaintiffs pray for judgment as set forth below.

## SECOND CAUSE OF ACTION
## Cal. Health & Safety Code §§ 19955 *et seq.*

43. Plaintiffs replead and incorporate by reference, as if fully set forth again herein, the allegations contained in Paragraphs 1 through 42 of this Complaint.

44. California Health & Safety Code §§ 19955 et seq. was enacted "[t]o insure that public accommodations or facilities constructed in this state with private funds adhere to the provisions of Chapter 7 (commencing with §4450) of Division 5 of Title 1 of the Government Code." Such public accommodations are defined as any "building, structure, facility, complex, or improved area that is used by the general public…," and includes hotels and curbs and sidewalks intended for public use. California Health & Safety Code § 19955.

45. On information and belief, the Studio and its related facilities underwent construction and/or alterations after January 1, 1982 that triggered access requirements under Title 24-2. Pursuant to Title 24-2, compliance with disabled access building standards and specifications is required whenever public accommodations, such as the Studio and its related facilities, undergo an "alteration, structural repair or addition."

46. Pursuant to the remedies, procedures, and rights set forth in Health & Safety Code § 19953, Plaintiff prays for judgment as set forth below.

## THIRD CAUSE OF ACTION
## UNRUH CIVIL RIGHTS ACT
## (Cal. Civ. Code §51 *et seq.*)

47. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 46 of this Complaint as if fully set forth herein.

48. The Studio is a business establishment and, as such, must comply with the provisions of the Unruh Act, Cal. Civ. Code, § 51, *et seq*.

49. The Unruh Act guarantees, *inter alia*, that persons with disabilities are entitled to full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever within the jurisdiction of the State of California. Cal. Civ. Code, § 51(b).

50. The Unruh Act also provides that a violation of the ADA, or of California state accessibility regulations, is a violation of the Unruh Act. Cal. Civ. Code, § 51(f).

51. Defendants have violated the Unruh Act by, inter alia, denying, or aiding or inciting the denial of, Plaintiffs' rights to full and equal use of the accommodations, advantages, facilities, privileges, or services offered at the Studio.

52. Defendants have also violated the Unruh Act by denying, or aiding or inciting the denial of, Plaintiffs' rights to equal access arising from the provisions of the California state accessibility regulations and the ADA.

53. Pursuant to the remedies, procedures, and rights set forth in Cal. Civ. Code § 52, Plaintiffs pray for judgment as set forth below.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request:

1. That this Court issue an injunction pursuant to Title III of the ADA and Plaintiff's related state law claims:

   a) Ordering Defendants to alter their facilities to make such facilities readily accessible to and usable by individuals with disabilities; and

   b) Prohibiting operation of Defendants' public accommodations and facilities until they provide full and equal access to physically disabled persons, and requiring that such access be immediately provided.

2. That this Court award general, compensatory, and statutory damages pursuant to the Unruh Act in an amount within the jurisdiction of this court, and that these damages be trebled according to statute;

3. That this Court award special and consequential damages according to proof;

4. That this Court award attorneys' fees, litigation expenses and costs of suit, pursuant to Title III of the ADA, 42 U.S.C. § 12205; Cal. Civ. Code §§ 52, and 55; Cal. Health & Saf. Code § 19953; and Cal. Code of Civil Procedure § 1021.5; and

5. Such other and further relief as the Court may deem just and proper.

Dated: May 10, 2012

**BARBOSA, METZ & HARRISON, LLP**

By: ______________________

JEFF A. HARRISON
ADAM S. CHERENSKY
Attorneys for Plaintiffs,
ARNIE T. PIKE and CHRISTIE RUDDER

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury for all claims for which a jury is permitted.

Dated: May 10, 2012

**BARBOSA, METZ & HARRISON, LLP**

By: ______________________

JEFF A. HARRISON
ADAM S. CHERENSKY
Attorneys for Plaintiffs,
ARNIE T. PIKE and CHRISTIE RUDDER

COPY

**By Fax**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Arnie T. Pike; Christie Rudder

**DEFENDANTS**
CBS Broadcasting, Inc.; Hudson Pacific Properties, Inc.; Sunset Gower Entertainment Properties, LLC; Sunset Bronson Entertainment Properties, LLC; Fremantlemedia North America

(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
JEFF A. HARRISON (SBN 151227); ADAM S. CHERENSKY (SBN 263062)
Barbosa, Metz & Harrison, LLP, 139 Richmond Street, El Segundo, CA 90245
Tel: (310) 414-9400; Fax: (310) 414-9200

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No

☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
VIOLATION OF TITLE III OF THE ADA AND CALIFORNIA'S CIVIL RIGHTS STATUTES (Civil Code §§ 51, 54, 54.1, and Health & Safety Code § 19955 et seq.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Act
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Info. Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

TORTS
PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Fed. Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury-Med Malpractice
- ☐ 365 Personal Injury-Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus-Alien Detainee
- ☐ 465 Other Immigration Actions

TORTS
PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 445 American with Disabilities - Employment
- ☑ 446 American with Disabilities - Other
- ☐ 440 Other Civil Rights

PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence Habeas Corpus
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus/ Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

FORFEITURE / PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety /Health
- ☐ 690 Other

LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

**FOR OFFICE USE ONLY:** Case Number: SA CV12-767.

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): ______

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): ______

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)
☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

*** Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): ______ **Date** May 10, 2012

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Andrew Guilford and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

**SACV12- 767 AG (RNBx)**

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [ ] **Western Division**<br>**312 N. Spring St., Rm. G-8**<br>**Los Angeles, CA 90012** | [X] **Southern Division**<br>**411 West Fourth St., Rm. 1-053**<br>**Santa Ana, CA 92701-4516** | [ ] **Eastern Division**<br>**3470 Twelfth St., Rm. 134**<br>**Riverside, CA 92501** |

Failure to file at the proper location will result in your documents being returned to you.

JEFF A. HARRISON (SBN 151227)
ADAM S. CHERENSKY (SBN 263062)
BARBOSA, METZ & HARRISON, LLP
139 Richmond Street, El Segundo, CA 90245
Tel: (310) 414-9400; Fax: (310) 414-9200
jharrison@bmhlegal.com; acherensky@bmhlegal.com

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Arnie T. Pike; Christie Rudder, and Individuals; PLAINTIFF(S) | CASE NUMBER SACV12-767. AG (RNBx) |
| v. | |
| CBS Broadcasting, Inc.; Hudson Pacific Properties, Inc.; Sunset Gower Entertainment Properties, LLC; Additional Defendants on Attached List DEFENDANT(S). | **SUMMONS** |

TO: DEFENDANT(S): ______________________________

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ __________ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Jeff A. Harrison and, whose address is Adam S. Cherensky, 139 Richmond Street, El Segundo, CA 90245. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: 5-11-12

By: SEAL AWYER
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CIVIL ACTION NO.: ______________________

## ATTACHMENT FORM TO SUMMONS IN A CIVIL ACTION

ADDITIONAL DEFENDANTS:

Sunset Bronson Entertainment Properties, LLC; Fremantlemedia North America; and DOES 1 through 10, inclusive